AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>CELLULAR TELEPHONE ASSIGNED CALL NUMBER<br>740-727-5167 (AT&T), IMSI: 310410118885028 | )<br>)<br>)<br>)<br>)<br>)    Case No. 20 mj 583 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein by reference.

located in the _____Southern_____ District of _____Florida_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B and/or affidavit, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to Possess with Intent to Distribute Controlled Substances |
| 21 U.S.C. 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

See attached affidavit incorporated herein by reference.

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

E. Travis Aaron, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 _____ *(specify reliable electronic means)*.

Date: Aug 26, 2020

*Judge's signature*

City and state: Columbus, Ohio

Elizabeth A. Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 740-727-5167 (AT&T), IMSI: 310410118885028** | Case No. 20 mj 583 <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, E. Travis Aaron, Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Resident Agency in Portsmouth, Ohio. I have been so employed since 2018.  Prior to joining the FBI, I worked as a law enforcement officer in varying capacities. I began my law enforcement career in 2012 as a patrol officer in Coulterville, Illinois, where I spent three years working on all case work assigned to my jurisdiction. I transferred to the Red Bud, Illinois Police Department in 2015 where I continued as a patrol officer for the city. I helped create an educational program for narcotics that was presented to the local school district along with certification as an Active Shooter Instructor by 4E. I transferred to Southern Illinois University-Edwardsville (SIUE) in 2016 as a patrol officer. I was promoted to a Field Training Officer for the department prior to leaving to accept a position as Special Agent for the FBI in 2018.

2.      As a federal agent, I am authorized to investigate violations of laws of the United States and have the authority to execute warrants issued under the authority of the United States. As part of my daily duties as an FBI agent, I investigate criminal violations relating to child exploitation and child pornography, including the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A, as well as drug-related offenses, including violations of 21 U.S.C. §§ 841 and 846.

3.      As a Special Agent, I am authorized to investigate violations of the laws of the

United States and to execute warrants issued under the authority of the United States.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF THE AFFIDAVIT

5. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (740) 727-5167, with International Mobile Subscriber Identity (IMSI): / 310410118885028, with listed subscriber David J. Flagg (the "Target Cell Phone"), whose service provider is AT&T, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300 North Palm Beach, FL 33408. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

6. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

7. Based on the facts set forth in this affidavit, there is probable cause to believe that the offenses of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 and Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a) (1), have been committed, are being committed, and will be committed by David J. Flagg. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

8. Title 21, United States Code, Section 846, makes it a federal crime for any person to attempt or conspire to commit any offense defined within the subsection, which in the case of

2

this investigation is Title 21, United States Code, Section 841(a)(1), making it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

9.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### A.     *Porter's Use of Drugs to Obtain Sexual Access to Children.*

10.     In approximately April of 2019, the FBI began investigating Larry Dean Porter. The investigation was initiated due to reports from several sources in the Portsmouth and South Webster areas who indicated that Porter was sexually abusing minors, and that such abuse was occurring with the consent of the minors' parents, who were receiving illegal controlled substances from Porter. After conducting several interviews, the investigation stalled because additional witnesses could not be interviewed without risking that Porter would learn of the investigation.

11.     In March of 2020, the investigation into Porter's illegal activities was revived through information obtained from the Jackson County Sheriff's Office (JCSO). JCSO detectives were approached by a Confidential Human Source (CHS1) who stated that s/he had information pertaining to Porter's involvement in human trafficking. CHS1 informed the detectives that Porter had contacted CHS1 via telephone in approximately 2013 and offered to provide CHS1 with narcotic pills in exchange for allowing Porter to "babysit" his/her significant other's 2-year-old child. CHS1 explained that Porter used the term "babysit" to refer to the time he spent with children during which he sexually abused them or took sexually explicit images of them. In subsequent interviews with CHS1 after PORTER's arrest, s/he indicated that s/he first met Porter through a significant other who purchased marijuana from Porter. CHS1 also obtained both marijuana and narcotic pills from Porter in the past. Since approximately January 2020 and on numerous occasions, CHS1 has provided reliable information to law enforcement regarding potential criminal activity of others. Under the control of JCSO detectives, CHS1

3

communicated with Porter via Facebook to arrange to sell a seven-year-old child to Porter in exchange for $80 that was to be given to the child's drug-addicted mother. When Porter arrived at the planned meeting location, he was arrested by JCSO detectives.

12. Subsequent to Porter's arrest on March 10, 2020, your affiant and other federal and local law enforcement officers conducted numerous interviews and executed numerous search warrants. During the course of the investigations both prior to and subsequent to Porter's arrest, your affiant identified and/or interviewed nine confidential sources (CHS1 through CHS9); eight individuals who had sold children to Porter for drugs or engaged in sex acts with children at Porter's direction in exchange for drugs (SUSPECTS #1-4, Charity Rawlins, Ronnie Rawlins, Joshua Aldridge, Beverly Holbrook); and at least 10 victims who had been sexually abused by Porter when they were minors (VICTIM 1 through VICTIM 10), eight of whom were sold to Porter in exchange for drugs. As a result of the information obtained from these sources and evidence obtained from search warrants executed at numerous residences and for the content of numerous Facebook accounts, on May 27, 2020, Larry Dean Porter, Crystal Porter, Denna Porter, Dave Cole, Frank Andrews, and Erroll Wayne Porter, Sr. were arrested on federal criminal complaints charging the defendants with crimes related to child sex trafficking, production and possession of child pornography, obstructing a child sex trafficking investigation, witness tampering, and conspiracies or attempts to commit the foregoing crimes. Charity and Ronnie Rawlins were also subsequently arrested on child sex trafficking charges. All the previously arrested individuals, as well as Joshua Aldridge, were indicted by the Grand Jury for the Southern District of Ohio on June 23, 2020.[1] Amongst other offenses, the defendants were charged with engaging in a sex trafficking conspiracy, substantive sex trafficking offenses, conspiracy to obstruct the enforcement of the sex trafficking statute, 18 U.S.C. § 1591(a), witness tampering, and making false statements to federal officers.

13. Interviews of the aforementioned SUSPECTS, VICTIMS, and confidential sources confirmed that Porter was regularly providing opioid-based pills, along with marijuana and cash, to the SUSPECTS in exchange for sexual access to minors. Several of the VICTIMS

---

[1] Beverly Holbrook was indicted in the Scioto County Court of Common Pleas in or about August of 2020, on two counts of Rape, two counts of Obstructing Justice, one count of Engaging in a Pattern of Corrupt Activity, and one count of compelling prostitution.

revealed that they were also frequently given pills that they believed to be illegal drugs. As described in more detail below, several of the individuals interviewed had information pertaining to the individual who provided Porter with the opioid-based pills, providing the name "Big D."

14.     Various searches of Porter's residence and digital media, as well as the residences of his co-defendants resulted in information that tended to confirm Porter's regular distribution of marijuana and prescription pills in exchange for sexual access to children. During an initial consensual search of Porter's residence on March 11, 2020, officers observed a strong odor of marijuana, but were only able to find a small amount of a green leafy substance believed to be marijuana.   During the execution of a search warrant at Porter's residence several weeks later, officers no longer observed the odor, but were able to locate several hidden compartments that had not been observed during the initial search. The compartments appeared to have been opened and emptied during the time between the searches, which coincided with information provided by CHS3 and CHS4 about the individuals removing items from Porter's residence and property. The execution of that search warrant also resulted in discovery of a hidden SD card that contained images of SUSPECT #1 sexually assaulting VICTIM 3 in Porter's residence. SUSPECT #1, VICTIM 3, and SUSPECT #2 (who had access and control of VICTIM 3), all confirmed that Porter took the pictures and gave them all opioid-based pills.

## B.     *David Flagg's Prescription Pill Activities and Communications with Porter*

15.     Your affiant first became aware of Porter's pill supplier, "Big D," later identified as Johnathan David Flagg (Flagg), when SUSPECT #2 identified him as Porter's pill supplier. SUSPECT #2 identified an individual she only knew as "Big D," who provided Porter with pills that Porter then either sold or gave away.  CHS3 also reported s/he observed Porter got his pills from a guy who drove a lifted white Ford pick-up truck, a lifted black Ford pick-up truck and a souped-up black Mustang that he used to deliver the pills to Porter. CHS3 described the guy as being white, stocky and with a little bit of a gut and who went by "Big D." Later identified from a search of Ohio Law Enforcement Gateway (OHLEG) records, Flagg has a black truck and a white truck registered in his name, and his height: 5'7", weight: 298 pounds and photograph matched CHS3's physical description.  An open source online search for David Flagg revealed a Facebook account/page bearing the same name: Facebookdavid.flagg.77 (100000841086415,

which contained an image of a black Mustang that matched the description of a souped-up black Mustang described by CHS3.

16.　　Following up on the information provided by CHS3 and SUSPECT #2, agents searched for references to Big D in the phones that were seized from Porter and his co-defendants, as well as in the content of their Facebook accounts, all of which were obtained through the execution of numerous search warrants. Review of Porter's cellular telephone extraction revealed two contacts with matching phone numbers: "D Big," associated with phone number 740-727-5167; and "Flagg David," associated with the same phone number: 740-727-5167. On or about April 15, 2020, agents received records from AT&T pertaining to cellular telephone number 740-727-5167. The records from AT&T show David D. Flagg, credit address: 1379 Mohawk Drive Lucasville, Ohio 45648, and contact home email:davidflagg69@yahoo.com is the financially liable party. The AT&T records further showed that Jonathan D. Flagg is the user of cellular telephone number 740-727-5167 with International Mobile Subscriber Identity (IMSI): 310410118885028. Facebook records pertaining to Flagg's Facebook account (david.Flagg.77 (100000841086415) also show, among other things, an associated email address davidflagg69@yahoo.com and an associated phone number of 1-740-727-5167.

17.　　On March 19, 2020, a search warrant was served on Facebook for the content of Porter's Facebook account larry.Porter.313924 (User ID: 100034786683030). Your affiant, with the assistance of other members of the FBI, reviewed the responsive information provided by Facebook. The basic subscriber and administrative information revealed that Porter activated this account in March 2019, after he believed his prior Facebook account had been "hacked."

18.　　A review of the substantive content of the larry.Porter.313924 Facebook account identified communications between Porter and his associates that appear to reference Porter's illicit trafficking of marijuana and prescription pills, specifically opioid based pills. The content of the Facebook communications further confirm that Porter exchanged illegal narcotics for sex with children as described above.

19.　　Specific to prescription pills, agents discovered Facebook communications between Porter and Facebook user david.Flagg.77 (User ID:100000841086415). Although the communications are coded, your affiant's interpretation of that code is that Porter sold the pills he obtained from Flagg and periodically updated Flagg with the status of the money he raised

from selling the pills. Once Porter reached a certain level of money, Flagg and Porter used Facebook to coordinate a meeting, so Flagg could recover his money and provide Porter with a fresh delivery of pills to sell. The following are examples of these communications that were found within Porter's Facebook account.

20.     Between April 16-17, 2019, Porter communicated with Flagg about illicit drug sales saying, "good evening, when is the next time u gonna come c me?" Your affiant believes this was a coded way for Porter to inform Flagg that he was ready to provide Flagg his money for pills Porter sold. In the below conversation Porter used the coded term "tools" to reference money, and in response when Flagg says, "Got ya tm," he was saying he was going to resupply Porter with pills the next day, which is indicated by Porter's offer to ride with Flagg. The conversation continued:

- Porter: i still have yr tools
- Flagg: My tools?
- Porter: lol
- Porter: u no
- Porter: read between the lines lol
- Flagg: Got ya tm [tomorrow]
- Porter: need anyone to ride with ya
- Flagg: No
- Porter: lol
- Porter: hey, wat time u want me to bring yr tools back?
- Porter: lol
- Flagg: I'll message when to the house I'll give you a better time when I get closer
- Flagg: Come on out

21.     In a similarly coded conversation on April 22, 2019, Flagg appeared to be inquiring as to the status of Porter's pill sales:

- Flagg: How's it going
- Porter: yo, it's comin but a little slow seems like
- Porter: alot of em r goin to eifort  i guess
- Porter: some don't no me but i like it that way. lol
- Porter: only round 700 at the monment
- Porter: i think
- Porter: lol
- Porter: but still got em

22.     This conversation appeared to continue on April 25, 2019, with Flagg again starting the conversation by asking Porter "How's it going."  Porter responded that it was slow,

then stated "update 2050," which you affiant believes refers to the amount of money Porter then had obtained through his pill sales. Porter assured Flagg that it wouldn't be long and that "eifort is out."

23. This pattern of Flagg checking on Porter's pill sales, and Porter providing a status continued at least monthly, leading up to Porter's arrest on March 11, 2020. Particularly, both in June of 2019 and as late as February of 2020, Flagg and Porter engaged in a similar conversation, with Flagg reaching out to Porter to ask "How we looking" or "How's it going." During both conversations, Porter sent Flagg messages that said "update" and then a number that you affiant believes to refer to the amount of money Porter had made through his pill sales (1500 in June of 2019 and 1400 plus in February).

24. Based on record checks revealing that Flagg possesses an active Tennessee driver's license and resides in Lucasville, Ohio, and information provided by various sources and victims indicated that Porter's drug supplier obtained those opioids that he supplied to Porter from out of state, your affiant developed the belief that Flagg was traveling to Tennessee to obtain prescription opiates that he supplied to Porter. Your affiant therefore collaborated with agents and analysts assigned to the Tactical Diversion Squad of the Drug Enforcement Agency (DEA) in Columbus, Ohio. It was determined from records obtained from the Pharmacy Board in Tennessee that Flagg, over the last five years, has seen nine Tennessee nurse practitioners who prescribed Flagg a combined total of 7,923 dosage units of Oxycodone; and 2,624 dosage units of Oxymorphone. The majority of those drugs were prescribed to Flagg by six nurse practitioners working at a specific pain institute in Clarksville, Tennessee; and filled at three specific pharmacies in Clarksville, Tennessee.

25. From Tennessee pharmacy board records dating January 1, 2015 through April 13, 2020, Flagg was prescribed only pain medications. Between January 2015 and June 2016, Flagg was receiving 112 Oxycodone HCL 30 milligrams every 28 days. From approximately, July 2016 through April 2020, Flagg was prescribed 112 Oxycodone, 20 milligrams and 26-56 Oxymorphine, 10 milligrams every 28 days. Records from Tennessee Motor Vehicles show Flagg has a license from Tennessee that was issued July 13, 2018 and expires July 13, 2026, with an address of 1960 Madison Street Clarksville, Tennessee 37043. Open source record checks revealed that 1960 Madison Street is a UPS store located in a strip mall. Another address Flagg

used in the past was also a UPS store, located at 695 National Pike, Gallatin, Tennessee. According to a check of the Ohio Law Enforcement Gateway records, Flagg's true residence is 1379 Mohawk Drive Lucasville, Ohio 45648. Surveillance activities at this residence confirmed that vehicles similar to those described by CHS3 as being driven by Big D were regularly parked at this residence. From the training and experience of agents and analysts from the DEA, with whom your affiant communicated, there is no medical reason/necessity for Flagg to travel from Ohio to Tennessee for pain management other than to obfuscate his acquisition of pills for the purpose of illegally selling the pills, obtained through insurance at little or no cost, to then sell for profit. Furthermore, your affiant learned from agents and analysts from the DEA that it is common from individuals seeking to conceal their illegal acquisition of prescription opiates by obtaining identifications in states where they do not reside, and they use UPS store addresses to obtain drivers licenses in these states to facilitate their activities.

26.     Your affiant combined records obtained from the Tennessee Prescription Monitoring Program ("PMP") Patient RX History Report for Jonathan David Flagg, for the time period spanning January 1, 2015 to May 14, 2020, with Facebook communications between Porter and Flagg spanning March 2019 through February 2020. The combination of records revealed that Flagg would immediately communicate with Porter on the days he filled his prescriptions for opiates, and the two would coordinate meeting up during Flagg's travel from Clarksville, Tennessee and through Lexington, Kentucky, as will be detailed below. This pattern occurred approximately every 28 days from March 2019 through February 2020, not long before Porter's arrest on March 10, 2020.

27.     PMP records showed on March 20, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20mg tablets and 56 Oxymorphone 10mg tablets. On March 20, 2019 and on March 21, 2019, Porter and Flagg had the following Facebook conversation:

- Porter:   give me a holler
- Porter:   285-5649
- Flagg:   Now or when I get home
- Porter:   home
- Porter:   lol
- Porter:   e.t.a.?
- Porter:   r we gettin close

9

- Flagg: Yep I'm home now
- Porter: can i slide out
- Flagg: Sure
- Porter: give me abit
- Flagg: Ok
- Porter: i b there

28.    PMP records showed on April 17, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On April 17, 2019, Porter and Flagg had the following Facebook conversation:

- Porter: i still have yr tools
- Flagg: My tools?
- Porter: lol
- Porter: u no
- Porter: read between the lines lol
- Flagg: Got ya tm
- Porter: need anyone to ride with ya
- Flagg: No
- Porter: lol
- Porter: hey, wat time u want me to bring yr tools back?
- Porter: lol
- Flagg: I'll message when to the house I'll give you a better time when I get closer
- Flagg: Come on out

29.    PMP records showed on May 15, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On May 15, 2019, Porter and Flagg had the following Facebook conversation as Flagg was driving back to Ohio from Tennessee:

- Porter: r ya gettin close yet
- Flagg: Lexington
- Porter: be safe
- Porter: holler at me when
- Flagg: Ok
- Flagg: In vancburg meet you at Kroger's
- Porter: kool
- Porter: b right there

30.    PMP records showed on June 12, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On June 12, 2019, Porter and Flagg had the following Facebook conversation:

- Porter:  Hello
- Flagg:  Hey
- Porter:  u rockin tomorrow
- Flagg:  Yep
- Porter:  kool beans
- Porter:  holler at me on way back when close
- Flagg:  I'll be home in an hour

31.      PMP records showed on July 7, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On July 11, 2019, Porter and Flagg had the following Facebook conversation:

- Porter:  yo, gettin close
- Porter:  to dinneer time
- Porter:  good morning
- Porter:  r u ok?
- Porter:  hope nuthin bad has happened to ya
- Porter:  got me worried

Although Flagg never responded, on July 13, 2019, Flagg wrote to Porter, seemingly checking on the status of Porter's pill sales:

- Flagg:  How's it going
- Porter:  it's comin along
- Porter:  pretty good
- Flagg:  Thank goodness
- Porter:  lol
- Flagg:  How's it going
- Porter:  little slow today but rasin
- Flagg:  Good deal

32.      PMP records showed on August 5, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On August 7, 2019, Porter and Flagg had the following Facebook conversation:

- Porter:  so when will u b seein me?
- Porter:  was hopin u went tommrow
- Porter:  c u on Thursday
- Porter:  but maybe not
- Porter:  let me no
- Porter:  noone has out here
- Porter:  eifort is out
- Porter:  u gonna b able to make yr app? hoping so.
- Flagg:  I've got them but I can only let 50 go I got to check back in on the 18th

11

- Porter: kool beans
- Porter: how can we hook up
- Porter: do i need to come to cinn.?

- Flagg: I'll be home on Friday

33. PMP records showed on September 3, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On September 3, 2019, Porter and Flagg had the following Facebook conversation:

- Flagg: Ol be home later
- Flagg: You ok
- Porter: yip
- Porter: wat up
- Flagg: I'll be home about 6
- Porter: k kool beans
- Porter: i b there at 6 somethin
- Flagg: I'll txt you when I get close
- Flagg: Home
- Porter: k kool
- Flagg: I'll meet you here at 7:10

34. PMP records showed on October 1, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On October 1, 2019, Porter and Flagg had the following Facebook conversation:

- Porter: let me no when ya get close

- Flagg: OK I am probably looking maybe around 9 o'clock

35. PMP records showed on October 29, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On October 29, 2019 and October 30, 2019, Porter and Flagg had the following Facebook conversation:

- Flagg: What's up
- Porter: wat ya doin
- Flagg: I'll give you a shout after work
- Porter: want me to head on out? i'd like to get back b4 dark, tranny leaking fluid.
- Porter: and it raining so i can't fix it
- Flagg: I'll bring them out later
- Porter: i ok i not leakin that bad lol
- Flagg: I've got some stuff to do

12

- Porter: well shoot
- Porter: people just gonna have to wait i guess lol
- Flagg: On my way

36.     PMP records showed on November 26, 2019, Flagg filled two prescriptions from two separate practitioners from a pain institute in Clarksville, Tennessee totaling 216 Oxycodone 20mg tablets and two prescriptions totaling 54 Oxymorphone 10 mg tablets. On November 26, 2019 and November 27, 2019, Porter and Flagg had the following Facebook conversation:

- Flagg: I'm Lexington
- Porter: k kool
- Porter: bout 9:30?
- Flagg: Should be
- Porter: when u bout half hour away, holler at me
- Porter: got a few folks waitin
- Porter: lol
- Porter: I don't suppoe we could meet at krogers

37.     PMP records showed on December 23, 2019, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On December 23, 2019, Porter and Flagg had the following Facebook conversation:

- Porter: Hello
- Flagg: Howdy
- Porter: gettin close?
- Porter: got my tranny in
- Flagg: Good deal I just got home an was resting
- Porter: should i slide out
- Flagg: Sure if you want
- Porter: k
- Porter: be there shortly

38.     PMP records showed on January 20, 2020, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On January 20, 2020, Porter and Flagg had the following Facebook conversation:

- Porter: just checkin in
- Porter: got my fingers crossed
- Porter: lol
- Flagg: Yeah I'm just now coming out of Lexington
- Porter: kool beans
- Porter: 2 1/2 hours

13

- Porter: krogers b kool
- Porter: it's so fuckin cold n my heater ain't worth a hoot
- Porter: u no bout when to call me n i meet u
- Porter: i stay on here
- Flagg: 20 mins
- Porter: should i leave now
- Flagg: Yes
- Porter: k
- Porter: omw
- Porter: krogers ?
- Flagg: Yes

39.    PMP records showed on February 17, 2020, Flagg filled a prescription from a pain institute in Clarksville, Tennessee for 112 Oxycodone 20 mg tablets and 56 Oxymorphone 10 mg tablets. On February 17, 2020, Porter and Flagg had the following Facebook conversation:

- Porter:  i got gas money, i can slide out to yr place or meet in the burg. it's up to u. just let me no when n where
- Flagg:   I haven't even walked into the office yet
- Porter: lol
- Porter: i didn't u did lol
- Porter: that didn't come out right lol
- Porter: c ya later
- Porter: on the road again, good old willie
- Porter: lol
- Porter: i got 8 bucks, i can make it to yr house
- Flagg:   I know I'm not home yet
- Porter: just let me no when yr ready
- Porter: oh yeah, i got that 200 for u
- Porter: that'll help ya out some lol
- Porter: eta
- Porter: ?
- Porter: u made it in yet or gettin close

40.    In many of the communications Porter had with his drug customers, he referenced having access to 20 milligram and 10 milligram pills. For instance, in the following Facebook conversation between Porter and SUSPECT #2, Porter discussed having pills available:

- SUSPECT #2: I know it's a long shot but would you be able to bring us one over for US to buy
- Porter: u want me to come pick u up
- SUSPECT #2: I guess

14

- Porter: start walkin
- Porter: lol
- SUSPECT #2: Well I was gonna have you come here so you could bring [SUSPECT #2's fiancé]
- Porter: I hate that road
- Porter: Have em walk up with u
- SUSPECT #2: He probably won't
- Porter: and the 1 by herself
- Porter: u no
- SUSPECT #2: Yeah
- SUSPECT #2: We will meet you up the barn bring both ours please
- SUSPECT #2: Which ones you got
- Porter: K Kool
- Porter: same
- SUSPECT #2: 10s and 20s
- SUSPECT #2: We wanna buy one too
- SUSPECT #2: So you have both
- Porter: Yip

41.     In another communication between Porter and Facebook user "MR" hat occurred on October 12, 2019, MR wrote, "You going to be home round 12:30-1 today." Porter responded, "3's r gone still got other. I thought I had a couple but I don't."  MR wrote, "Crap ok. Will you hold 3 of the 20s?"

42.     The foregoing communications are just a few examples of the multiple conversations in which Porter identified the quantity in milligrams for pills that he was selling that matched those pills that Flagg obtained from Tennessee and is believed to have provided Porter.

43.     Evidence indicates that Flagg has been selling pills to Porter since at least 2015. During a custodial interview on June 10, 2020, Charity Rawlins identified knowing a heavy set white male, whom she identified as "Big D," as the individual who supplied Porter with pills. According to Charity, Big D had been supplying Porter pills since 2015 or earlier. Porter would receive 60 to 120 "30's" (30 milligram Oxycodone pills) from Big D on a monthly basis. Big D would also provide "20's" (20 milligram Oxycodone pills) and other pills to Porter for him to sell. Porter told Charity that Big D would go to Tennessee to a doctor who would provide his prescriptions; that Big D would stay all night in a hotel and then travel back home. Big D would provide the pills to Porter and Porter, in turn, would sell the pills and then give the money back

to Big D. Charity observed Big D driving a black or blue newer Ford F-150 truck, Equinox, and a nice black car, all of which match vehicles Agents have associated with Flagg.

44.     During a custodial interview in June of 2020, SUSPECT #2 also identified an individual she knew as "Big D" who would provide pills to Porter.  SUSPECT #2 recalled that if she was at Porter's residence when Big D delivered pills, Porter would send her back to Porter's bedroom, so she could not observe what was happening between Porter and Big D.  SUSPECT #2 estimated that Big D was providing Porter with pills at least as far back as 2016. At first, Big D provided Porter with 30's (30 milligram Oxycodone), but more recently Big D was providing 20's (20 milligram Oxycodone) and 10's that SUSPECT #2 identified as little light-red pills (10 milligram Oxymorphone).

45.     According to PMP records for Flagg, between January 6, 2015 and June 9, 2016, Flagg was written 20 prescriptions for a total of 2,172, 30 milligram Oxycodone. Between July 7, 2016 and April 13, 2020, Flagg was written 52 prescriptions for a total of 5,751, 20 milligram Oxycodone. Between August 4, 2016 and April 13, 2020, Flagg was written 50 prescriptions for a total of 2,540, 10 milligram Oxymorphone pills. Your affiant believes the PMP records corroborate the above information provided by SUSPECT #2 and SUSPECT #4, in the types and strength of pills Flagg was providing Porter, as well as the method Flagg was obtaining the pills, thus your affiant believes the drug trafficking conspiracy between Flagg and Porter extends as far back as January 2015.

46.     PMP records for Flagg indicate he continues to travel to Tennessee and refill his prescriptions, even after Porter's arrest on March 10, 2020.  As previously mentioned, Flagg had traveled to Tennessee on April 13, 2020 and received a refill quantity of 112, 20 MG Tablet's for Oxycodone and a quantity of 56, 10 MG Tablet's for Oxymorphone. Financial records support Flagg's travel to Tennessee with debit purchases from his personal checking account on April 12, 2020, while in Clarksville TN, in the amount of $3.06 to Taco Bell and $19.25 to Walmart. Continued purchases on April 13, 2020 were made in Clarksville, TN, in the amount of $179.36 to Clarksville Pain, $60.00 to Pharmacy Solutions, $2.62 to McDonald's, $24.78 to Walmart, and $18.99 to Lowes.

47.     On August 24, 2020, the License Plate Reader (LPR) database was reviewed for historical location information for vehicles registered to Flagg.  Those LPR records revealed that

Flagg's Ohio Registered vehicle bearing Ohio license plate number HWV9362, was identified on June 8, 2020, in a parking lot at Walmart, 2315 Madison Street, Clarksville, TN. The diagram below demonstrates the location where Flagg's vehicle was observed in the LPR records in correlation to the Clarksville Pain Institute, 1849 Madison Street, Clarksville, TN, where records indicate Flagg has regularly obtained his prescriptions. Along the route between these two locations is Flagg's registered address as provided with his Tennessee driver's license records, 1960 Madison Street (UPS Store), Clarksville, TN.



48.     Your affiant submits that the Target Cell Phone was used to facilitate communication with Porter while Flagg traveled to Tennessee and obtained prescription medication that he provided to Porter, and which Porter then used to trade for sex with minors. The collection of location information for the Target Cell Phone for the next 30 days, will assist in corroborating in real time Flagg's known date and direction of travel in the acquisition of future prescriptions.

49.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as

17

"tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

50.     Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available.

51.     Based on my training and experience, I know that AT&T can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

52.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

53.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

54.     I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

55.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

19

56.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

E. Travis Aaron
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _August 26___, 2020_

Elizabeth Preston-Deavers,
United States Magistrate Judge
United States District Court, Southern District of Ohio

20

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (740) 727-5167, with International Mobile Subscriber Identity / Electronic Serial Number 310410118885028, with listed subscriber, David J. Flagg (the "Target Cell Phone"), whose wireless service provider is AT&T ("the Provider"), headquartered at 11760 U.S. Highway 1, Suite 300 North Palm Beach, FL 33408 .

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of AT&T: including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute Controlled Substances; 21 U.S.C. § 841(a) (1) Possession with Intent to Distribute Controlled Substances involving David J. Flagg.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

2